153 P.3d 1055

Kenyon CARLSON, Plaintiff/Appellant,

v.

The ARIZONA STATE PERSONNEL BOARD; Gwendolyn Hatcher, Chairman; Steve Sepnieski, Vice–Chairman; Jeff Grant, Board Member; Simon Deltran, Board Member, in their official capacities; The Arizona Department of Environmental Quality; Steve Owens, in his official capacity as Director of Department of Environmental Quality, Defendants/Appellees.

No. 1 CA–CV 06–0110.

Court of Appeals of Arizona, Division 1, Department E.

March 6, 2007.

Jeffrey F. Arbetman, Phoenix, Attorney for Plaintiff–Appellant.

Ridenour, Hienton, Kelhoffer, Lewis & Garth, PLLC By Jeffrey A. Bernick, Michele Molinario, Phoenix, Attorneys for Defendant–Appellee State Personnel Board.

Terry Goddard, Attorney General By Michael M. Walker, Assistant Attorney General, Phoenix, Attorney for Defendant–Appellee ADEQ.

## OPINION

HALL, Presiding Judge.

¶ 1 Kenyon Carlson appeals from the superior court's judgment affirming the decision of the Arizona State Personnel Board (the Board) to uphold his dismissal from employment by the Arizona Department of Environmental Quality (ADEQ). Because the Board upheld Carlson's termination for reasons not asserted by ADEQ in its notice of dismissal, we vacate the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 While employed by ADEQ, Kenyon Carlson and Kathleen Gustafson had a consensual intimate relationship. They lived together from July 2001 until August 2002, when Gustafson purchased her own home.

¶ 3 Carlson was a quality assurance manager and directly supervised Gustafson's work as an administrative assistant. He gave Gustafson high ratings on her employee performance appraisals and attempted to help her gain promotions within ADEQ. Both Carlson and Gustafson lied in response to supervisors' inquiries about the nature of their relationship.

¶ 4 Carlson and Gustafson remained friends after their romantic relationship ended in 2002, and Carlson loaned more than $25,000 to Gustafson in 2003. After Carlson began pressing Gustafson for repayment, she blocked him from her home e-mail account. On December 7, 2003, Carlson sent an e-mail from his ADEQ computer to Gustafson's

work computer stating that because she had "chosen this direction," he saw no reason to continue working for her promotion. Carlson repeated the substance of this e-mail message in a partially recorded telephone call to Gustafson in January 2004.

¶ 5 In January 2004, Gustafson reported to ADEQ management that Carlson was sexually harassing her. ADEQ put Carlson on administrative leave with pay pending an investigation. Following that investigation, ADEQ issued a Notice of Charges of Misconduct pursuant to Arizona Administrative Code (A.A.C.) R2–5–803, stating:

A dismissal is being considered based on these allegations, which constitute cause for disciplinary action as outlined in A.R.S. § 41–770 [1] and Department of Administration Personnel Rule R2–5–501 (Standards of Conduct).[2]

The letter further provided the following "specific charges and explanations":

In violation of the Department's Sexual Harassment Policy ... and of the Director's 9/15/03 e-mail ... renewing the Department's commitment to a harassment free environment:

1. You and Kathleen Gustafson, Administrative Assistant I, had a consensual romantic relationship, which ended. You were aware that Ms. Gustafson was interested in promoting or moving to a different position within ADEQ. You have, at various times, discussed possible positions for Ms. Gustafson with Joe McDonald, including positions in the lab that you supervised. These positions were frozen. The performance planners and appraisals you prepared for Ms. Gustafson indicate that with your encouragement, she was attempting to increase her knowledge and skills in the lab.

On December 3, 2003, after learning that Ms. Gustafson had blocked you from sending e-mail to her personal e-mail account, you sent an e-mail message from your ADEQ e-mail address to her ADEQ e-mail address, stating, in part: "Well, now that you have chosen this direction, I see no reason to continue working for your promotion...."

2. You called Kathleen Gustafson and said, pursuant to a recorded message later transcribed, in part: "I would have put all that work into [sic] if I would have had the relationship with you, yes, okay, I admit that, but I'm not willing to do that now...."

Your actions constitute a serious violation of statutes, rules and policies. In determining an appropriate penalty, consideration was give[n] to the fact that you attended ADEQ Workplace Harassment training 10/21/03.

¶ 6 Carlson responded to the charges by submitting a ten-page letter. On April 1, 2004, ADEQ served Carlson with a Notice of Dismissal. The dismissal notice identified the same facts alleged in the Notice of Charges of Misconduct as the reason for termination of employment and cited the same statute and administrative rule. The notice also reiterated that dismissal was considered appropriate because Carlson had attended a training session about sexual harassment in the workplace.

¶ 7 Carlson filed a timely notice of appeal with the Board pursuant to A.R.S. § 41–785(A) (Supp.2006). At his appeal hearing, Carlson attempted to show that, contrary to the findings of misconduct set forth in ADEQ's dismissal notice, he did not engage in "unwelcome sexual conduct or advances" that would constitute sexual harassment and that he had done nothing to injure Gustafson's employment opportunities at ADEQ. He claimed that Gustafson's allegations were motivated by a desire to avoid repayment of money he had lent her. The ADEQ officials

1. Section 41–770 (2004) provides fourteen separate bases for discipline or dismissal of a state service employee.

2. Arizona Administrative Code R2–5–501 lists standards of conduct, the violation of which, in addition to the statutorily prohibited conduct enumerated in Arizona Revised Statutes (A.R.S.) section 41–770 (2004), may result in discipline or dismissal of a state service employee. Code 501(B) lists four standards of "required conduct" and § 501(C) lists seven types of "prohibited conduct." Finally, § 501(D) subjects to disciplinary action an employee "who is found to have acted in reprisal toward an employee as a result of the exercise of that employee's rights."

testifying at the hearing confirmed that Carlson was discharged for violating the agency's sexual harassment policy based on the specific acts described in the written dismissal notice. In addition, the officials stated that no one had informed Carlson of any other reason for dismissal. Yet, over objection by Carlson's attorney, an ADEQ official testified that Carlson's actions had also violated provisions of the Standards of Conduct that were not specifically asserted as grounds for his termination in the dismissal notice.

¶ 8 The hearing officer agreed with Carlson's claim that he did not make unwelcome sexual advances toward Gustafson and that his cessation of efforts to help Gustafson obtain a promotion simply "level[ed] a playing field which had been improperly tilted in Ms. Gustafson's favor for two years." He concluded that ADEQ had failed to prove that Carlson's conduct constituted sexual harassment as defined by ADEQ policies but found that Carlson had nonetheless violated several Standards of Conduct for state employees by lying about the relationship, giving preferential treatment to Gustafson, and creating a conflict of interest by giving money to Gustafson: R2–5–501(B)(1) (failing to maintain high standards of honesty, integrity, and impartiality free from personal considerations or favoritism); R2–5–501(B)(3) (failing to conduct himself in a manner that would not bring discredit or embarrassment to the State); and R2–5–501(C)(2) (permitting himself to be placed under any kind of personal obligation that could lead a person to expect personal favors).

¶ 9 Although the only reason ADEQ specifically alleged in both its Notice of Charges and Notice of Dismissal was that Carlson violated the agency's sexual harassment policy, the hearing officer concluded that Carlson could be dismissed for other statutory and rule violations not specifically charged because the notices stated that ADEQ had authority to dismiss Carlson pursuant to

A.R.S. § 41–770 and the Standards of Conduct. The hearing officer further found that Carlson admitted the facts that established his violations of the Standards of Conduct in his response to the Notice of Charges of Misconduct, belying any argument that he was "unfairly ambushed." Relying on the "right result—wrong reason" rationale that applies to appellate review of trial court judgments, the hearing officer concluded that due process was satisfied because the agency made the correct decision, even if based on the wrong reason. *See City of Phoenix v. Geyler,* 144 Ariz. 323, 330, 697 P.2d 1073, 1080 (1985) ("We recognize the obligation of appellate courts to affirm where any reasonable view of the facts and law might support the judgment of the trial court. This rule is followed even if the trial court has reached the right result for the wrong reason."). Accordingly, the hearing officer concluded that Carlson's dismissal was not arbitrary, capricious, or otherwise contrary to law and recommended that the Board deny the appeal. *See* A.R.S. § 41–785(C) ("The board may reverse an agency's action on appeal only if the board finds the actions to be arbitrary, capricious or otherwise contrary to law.").

¶ 10 Carlson filed objections to the hearing officer's Findings of Fact, Conclusions of Law, and Recommendations, asserting he did not receive notice of the charges upon which the hearing officer based his recommendation for dismissal. The Board eventually denied the appeal and adopted the hearing officer's Findings of Fact and Conclusions of Law.[3]

¶ 11 Carlson filed an administrative review complaint in the superior court pursuant to A.R.S. §§ 12–901 to –913 (2003) and 41–785(F). As did the Board, the superior court rejected Carlson's due process claim and affirmed the Board's decision. Carlson filed a timely notice of appeal to this court. We

---

**3.** The Board initially ordered that the matter be "sent back to the hearing officer to determine if facts exist to prepare an alternative for no disciplinary action so that the board will have two alternatives to consider at the next meeting." Accordingly, the hearing officer submitted an alternative report concluding the action of ADEQ in dismissing Carlson for violation of the sexual

harassment policy was not supported by the evidence, and was therefore arbitrary and capricious. In addition to his other arguments on appeal, Carlson argues that the Board violated R2–5–103 by failing to consider the hearing officer's alternative report. Because we are vacating the superior court's judgment on other grounds, we need not address this argument.

have jurisdiction pursuant to A.R.S. §§ 12–913 and –2101(B) (2003).

## DISCUSSION

¶ 12 On appeal, Carlson argues that the Board erred by affirming his dismissal for reasons other than those given by ADEQ and set forth in the Notice of Charges of Misconduct and Notice of Dismissal. Carlson contends that both the pre-termination and post-termination proceedings were inadequate and violated his right to procedural due process under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 2, Section 4, of the Arizona Constitution. Whether sufficient notice of the reason for discharge was given to an employee under a state merit system is a question of law that we review de novo. *See Smith v. Rosa*, 73 S.W.3d 862, 865 (Mo.Ct.App.2002).

¶ 13 In reviewing an agency's decision pursuant to the Administrative Review Act, the superior court must affirm the agency action unless it is "not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion." A.R.S. § 12–910(E) (2003). On appeal, we review de novo the superior court's judgment, reaching the same underlying issue as the superior court: whether the administrative action was not supported by substantial evidence or was illegal, arbitrary and capricious, or involved an abuse of discretion. *Siler v. Ariz. Dep't of Real Estate*, 193 Ariz. 374, 378, ¶ 14, 972 P.2d 1010, 1014 (App.1998). "Neither this court nor the superior court may substitute its judgment for that of the agency on factual questions or matters of agency expertise," but "[w]e apply our independent judgment ... to questions of law, including questions of statutory interpretation and constitutional claims." *Webb v. Ariz. Bd. of Med. Exam' rs*, 202 Ariz. 555, 557, ¶ 7, 48 P.3d 505, 507 (App. 2002).

¶ 14 Carlson was classified as a permanent status employee with ADEQ and therefore could be dismissed only for cause. *See State Pers. Comm'n v. Webb*, 18 Ariz. App. 69, 73, 500 P.2d 329, 333 (1972) (construing predecessor statute to A.R.S. § 41–770). Accordingly, he had a constitutionally protected property interest in continued employment that entitled him to due process before he could be terminated. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.' ") (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); *see also Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (stating that due process is a flexible concept calling for such procedural protections as the particular situation demands). In addition, Carlson also had a statutorily granted right to a post-termination administrative appeal. A.R.S. § 41–785.

¶ 15 As an employee who had a constitutionally protected property interest in his employment, Carlson was required to be given "some kind of hearing" before his discharge. *Loudermill*, 470 U.S. at 542, 105 S.Ct. 1487 (citation omitted). Because the purpose of a pre-termination hearing is not to conclusively establish the propriety of dismissal but to serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that charges against the employee are true and support the proposed action[,]" *id.* at 545–46, 105 S.Ct. 1487, the hearing "need not be elaborate" as long as notice and an opportunity to be heard are provided. *Id.* at 545, 105 S.Ct. 1487. A permanent public employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" in person or in writing. *Id.* at 546, 105 S.Ct. 1487. ADEQ observed Carlson's constitutional rights by providing him written notice of the charges against him and an explanation of the evidence supporting those charges, and giving him an opportunity to present his side of the story in writing. When coupled with his statutory right to a full evidentiary hearing as part of a post-

termination administrative appeal, *see* § 41–785(B), we conclude that Carlson received all the constitutional process to which he was due at the pre-termination stage.[4] Indeed, "[t]o require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487.

¶ 16 Having concluded that Carlson was not deprived of due process by the pre-termination procedures, we turn now to the post-termination procedures commencing with the Notice of Dismissal. In *Loudermill,* one of the primary reasons the Supreme Court approved less-than-rigorous pre-termination procedures was because of the right to a statutorily mandated administrative review and its guarantee of a full evidentiary hearing with attendant procedural protections. *Id.* ("Our holding rests in part on the provisions in Ohio law for a full post-termination hearing."); *see Deuel v. Ariz. State Sch. for the Deaf and Blind,* 165 Ariz. 524, 526, 799 P.2d 865, 867 (App.1990) (interpreting *Loudermill* as requiring the government to "fulfill its obligation to provide a meaningful hearing" when an employee is removed pursuant to informal pre-termination procedures).

¶ 17 Thus, before Carlson could be finally deprived of his constitutionally protected property interest in his continued employment, one of the protections to which he was entitled was an opportunity to be heard "at a meaningful time and in a meaningful manner" in his defense. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citation omitted); *Deuel,* 165 Ariz. at 526, 799 P.2d at 867. For such an opportunity to be meaningful, a terminated employee must be provided advance notice of the specific grounds for termination so he may prepare his defense. *Deuel,* 165 Ariz. at 527, 799 P.2d at 868 (citing *Goldberg v. Kelly,* 397 U.S. 254, 268, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (identifying one of the

purposes of an evidentiary hearing as providing an opportunity to effectively challenge the termination of welfare benefits "as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases")). For example, in *Elia v. State Board of Dental Examiners,* 168 Ariz. 221, 228, 812 P.2d 1039, 1046 (App. 1990), after noting that "[d]ue process assures an individual notice of the charges prior to commencement of a hearing so that the person charged has a meaningful opportunity for explanation and defense[,]" we concluded that Elia was not denied due process because the formal hearing was held five months after additional allegations were added to the original complaint. *See also Comeau v. Ariz. State Bd. of Dental Exam'rs,* 196 Ariz. 102, 108, ¶ 28, 993 P.2d 1066, 1072 (App.1999) (stating the due process rights of a medical licensee require "notice of the nature of the wrong charged and the particular instances of its perpetration" before sanctions can be imposed); A.R.S. § 41–785(A) ("The employee shall be furnished with specified charges in writing when the action [of dismissal] is taken.").

¶ 18 Clearly, substantial evidence supports the hearing officer's findings that Carlson's conduct violated the Standards of Conduct for State Employees. But the issue before us is whether Carlson's due process right to adequate notice was violated when the Board upheld his termination on grounds not alleged in the agency's dismissal notice.

¶ 19 Both ADEQ and the Board assert that Carlson received adequate notice of the legal basis for his termination because of the general references in the dismissal notice to A.R.S. § 41–770, listing fourteen causes for dismissal or discipline of merit system employees, and A.A.C. R2–5–501, which describes eight causes for dismissal or discipline. We can certainly foresee circumstances in which a general reference to

---

4.  ADEQ also complied with A.A.C. R2–5–803(A), which administratively mirrors *Loudermill's* requirements for a constitutionally adequate pre-termination hearing:

    Pre-dismissal procedures. Before an employee with permanent status can be dismissed, the agency head shall give the employee written notice of the charges, a summary of the agency head's basis for the charges, and an opportunity for the employee to present a written response. The employee's response shall be made not later than three working days after the employee receives notice of the charges, unless extended in writing by the agency head.

A.R.S. § 41–770 or A.A.C. R2–5–501, when coupled with a fair and accurate description of the underlying conduct, would provide adequate notice to an employee of the reasons for his dismissal. For example, an employee who is given written notice that he has been discharged for being intoxicated on duty or because he has been convicted of a felony would be unable to successfully claim that his due process rights were violated if the notice of dismissal, as here, referred only generally to A.R.S. § 41–770 rather than the specific subsection of the statute, that is, § 41–770(A)(7) (drunkenness on duty) or § 41–770(A)(10) (final conviction of a felony).

¶ 20 Even assuming the general validity of such an approach from a due process perspective, it does not work here, however, because the hearing officer rejected as unproven the only *factual* basis alleged by ADEQ in its dismissal notice: that Carlson violated the agency's sexual harassment policy. The only facts set forth in ADEQ's dismissal notice concerned Carlson's e-mail and telephone call to Gustafson, and these facts were identified as violating the department's sexual harassment policy. Carlson's defense was based on showing that Gustafson falsely alleged sexual harassment in order to avoid repaying a loan. Had ADEQ notified Carlson that in addition to sexual harassment, it dismissed him for lying, giving preferential treatment to Gustafson, and creating a conflict of interest by loaning money to Gustafson, it is reasonable to assume that his attorney would have presented a different defense. Indeed, in such a "switching" situation, prejudice is presumed. *See Murray v. Murphy*, 24 N.Y.2d 150, 299 N.Y.S.2d 175, 247 N.E.2d 143, 147 (1969) (holding employee's lawyer was entitled to prepare for hearing in reliance that charges would not be switched and employee may not lose substantial rights because of wrongdoing shown by the evidence but not charged).

¶ 21 We find support for our holding in decisions of courts from other jurisdictions that have held that a substantial variance between the stated grounds for termination and the actual grounds upon which discipline is imposed constitute denial of due process. *See McCall v. Goldbaum*, 863 S.W.2d 640, 642–43 (Mo.Ct.App.1993) (reversing personnel board's decision to uphold employing agency's dismissal of employee for neglect, sexual abuse, and consumption of alcohol while on duty when board's decision was based on finding employee did not consume alcohol on premises but engaged in abusive or improper treatment toward residents and made no finding as to sexual abuse charge); *Brixey v. Pers. Advisory Bd.*, 607 S.W.2d 825, 827 (Mo.Ct.App.1980) (reversing dismissal of teacher for being late to work, excessive absences, improper discipline, and undermining morale when notice of intent to dismiss made generalized charge of failure to perform job); *In re Herrmann*, 387 N.J.Super. 450, 904 A.2d 764, 768–69 (2006) (reversing dismissal of employee charged with flicking a cigarette lighter in proximity of child but dismissed for other conduct including failure to document, poor attitude, and lack of evaluative skills); *Murray*, 299 N.Y.S.2d 175, 247 N.E.2d at 147–48 (reversing police commissioner's dismissal of police officers for corruption when they had been charged with failing to properly investigate and the charge of corruption had been discussed and rejected by trial commissioner); *In re Matter of Discharge of Smith*, 30 Wash.App. 943, 639 P.2d 779, 780–81 (1982) (reversing commission decision upholding dismissal of employee for flashing badge to intimidate driver in nearby vehicle when employee had been charged with pointing pistol at the driver and lying about it).[5]

¶ 22 In summary, we conclude that the hearing officer erred by upholding Carlson's dismissal based on conduct never alleged by ADEQ before the post-termination hearing. Following Carlson's written response to the

---

**5.** ADEQ's reliance on *Hoflin v. City of Ocean Shores*, 121 Wash.2d 113, 847 P.2d 428 (1993), for the proposition that due process does not require an employer to specify the statute or ordinance it relies upon to justify dismissal is misplaced. The issue in *Hoflin* was the adequacy of the pre-termination proceedings, *id.* at 437, which we have determined were not deficient here. Moreover, unlike ADEQ, the governmental agency in *Hoflin* "properly inform[ed]" the employee of the "factual basis for dismissal." *Id.* at 439.

pre-termination charges and the results of its own investigation, ADEQ had information providing additional grounds that it could have used to terminate Carlson's employment. If ADEQ wanted to rely on these additional grounds, it should have set forth with reasonable specificity the amended factual basis and the statutory grounds for its decision in its Notice of Dismissal or a supplemental notice sufficiently in advance of the post-termination hearing to allow Carlson the opportunity to prepare his defense.

¶ 23 In addition to finding that the variance between Carlson's dismissal notice charges and the facts upon which the Board upheld dismissal denied Carlson procedural due process, we conclude that the Board exceeded its statutory authority. At oral argument, the Board contended that it had a "statutory mandate" permitting it to substitute reasons other than those relied upon by ADEQ based on the evidence presented at the hearing. We disagree. Although the "right result-wrong rationale" doctrine articulated by the ALJ is frequently used by appellate courts to affirm a trial court judgment in which the "right" result is reached, its application here would contravene fundamental notions of due process.[6]

¶ 24 Moreover, even in the absence of a due-process violation, we perceive nothing in the statutory scheme that would authorize the Board to independently dismiss an employee of another state agency; rather, it is authorized to hear appeals by state employees who have been dismissed, suspended, or demoted by a state agency. A.R.S. §§ 41–782 and –785 (2004). Indeed, the Board's power is statutorily limited to reversing or modifying agency actions that it finds arbitrary, capricious, or otherwise contrary to law or disproportionate to the proven offense in light of mitigating circumstances. A.R.S. § 41–785(C), (D). Therefore, notwithstanding Carlson's admissions, the Board exceeded its authority by substituting its own reasons for dismissal in place of those asserted by ADEQ. *Cf. Loudermill,* 470 U.S. at 543, 105 S.Ct. 1487 ("Even where the facts are clear, the appropriateness or necessity of the discharge may not be[.]").

¶ 25 Carlson requests an award of his attorneys' fees incurred on appeal pursuant to the private attorney general doctrine and A.R.S. § 12–341 (2003). Because Carlson is requesting relief that benefits only himself, and his success on appeal does not vindicate an important public right, we find the private attorney general doctrine inapplicable. *See Arnold v. Ariz. Dep't of Health Serv.,* 160 Ariz. 593, 608–09, 775 P.2d 521, 536–37 (1989). Additionally, as noted by ADEQ, § 12–341 provides for an award of costs, not fees, and Carlson failed to cite any other statutory basis for a fee award. Therefore, we deny Carlson's attorneys' fee request.

## CONCLUSION

¶ 26 For the reasons stated, we vacate the judgment of the superior court upholding the decision of the Board and remand for further proceedings consistent with this opinion. As the prevailing party on appeal, Carlson is entitled to recover his costs pursuant to A.R.S. § 12–342 (2003) following submission of a statement of costs in compliance with

---

6. As Sir Thomas More was said to have argued in the play *A Man For All Seasons* by Sir Robert Bolt, even an evil man is entitled to the protection of the laws. Sir Thomas, then serving as the Lord Chancellor, had refused to arrest a man that his daughter and son-in-law, Will Roper, regarded as bad because "[t]here is no law against that." When Roper presses Sir Thomas by asserting that Sir Thomas apparently would give even the Devil the benefit of the law, the following conversation ensues:

> Sir Thomas: Yes. What would you do? Cut a great road through the law to get after the Devil?
> Roper: I'd cut down every law in England to do that!
> Sir Thomas: Oh? ... And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? ... This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down ... d'you really think you could stand upright in the winds that would blow then? ... Yes, I'd give the Devil benefit of law, for my own safety's sake.

Likewise, even though substantial evidence supports the hearing officer's findings, we decline to "cut down the laws" to reach the "right" result.

**434**

Arizona Rule of Civil Appellate Procedure 21(a).

ANN SCOTT TIMMER, Judge, concur.

GAINES, Judge,[7] concurring specially.

¶ 27 I concur in the result and agree that the Notice of Dismissal and supplemental notice in advance of the post-termination hearing are insufficient to support the rationale of the hearing officer's recommendation.

¶ 28 The question is close and not free from doubt. Carlson's ten-page letter with eight attachments responding to the notice of charges contains and admits every fact which the majority acknowledges, and I agree, is sufficient "substantial evidence" to support the hearing officer's finding of violations of four, separate provisions of the Standards of Conduct. The notice of charges referred to the Standards of Conduct. Carlson was represented by experienced, capable counsel at a three-day evidentiary hearing. The story of his relationship with Gustafson was aired in all its sordid detail. Carlson was not prevented or inhibited from offering his own evidence.

¶ 29 In these circumstances, the hearing officer, the Board and the trial court all considered and rejected Carlson's argument that the notice was inadequate to permit him to prepare a defense.

¶ 30 The purpose of the requirement for adequate notice of the reason for termination is to permit the employee to prepare a defense to the reason given by the agency. *See Deuel v. Ariz. State Sch. For the Deaf and Blind,* 165 Ariz. 524, 527, 799 P.2d 865, 868 (App.1990); *McCall v. Goldbaum,* 863 S.W.2d 640, 642–43 (Mo.Ct.App.1993). The fundamental unfairness addressed in the "charge-switching" cases, some of which are cited in the majority opinion, is apparent. The unfairness here is not so apparent.

¶ 31 It is also unclear whether the remand will serve any useful purpose or lead to any different result given the state and source of the evidence (Carlson's own, detailed letter) and our agreement that the evidence supports the hearing officer's findings and recommendation. To require an amended charge, or a new one, based on Carlson's acknowledgment of his own conduct may seem overly formal and perhaps futile.

¶ 32 A cornerstone of our jurisprudence and traditional notions of justice and fair play has for centuries been the right of a person accused, whatever the forum, to know what he or she is charged with, no matter how technical, redundant or superfluous the requirement for a specific charge may seem in a given case.

¶ 33 An entertaining, instructive example of this principle is found in the well-known trial of the prominent Quaker, William Penn, and his colleague, William Mead, in 1670. They were charged with the common-law crime of causing a "tumultuous assembly" by preaching in London's Gracechurch Street. Penn inquired of the Recorder (judge) where he might find the law under which he was charged. The Recorder answered that the common law was unwritten law (*"lex non scripta"*), which "many have studied thirty or forty years to know." Penn responded, "[I]f the common law be so hard to be understood, it is far from being very common." 6 HOWELL'S STATE TRIALS 951, 958–59 (1816)[8].

¶ 34 Here, the factual portion of the notice of charges referred only to alleged violations of the sexual harassment policy. The majority accurately describes the document's contents and import. *See supra* ¶ 5. Fairly read, the charging document was insufficient to support the hearing officer's findings. For this reason, and this reason only, I agree with the result.

---

**7.** The Honorable Pendleton Gaines, Judge *Pro Tempore* of the Court of Appeals, Division One, has been authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. 6, § 31, and A.R.S. §§ 12–145 through 12–147 (1992).

**8.** A modern example is the action of Dean Wormer of Faber College in placing the members of Delta House fraternity on "double secret probation." ANIMAL HOUSE (Universal Pictures 1978).