NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

NISHITH S. SHAH, *Plaintiff/Appellant,*

*v.*

ARIZONA STATE BOARD OF DENTAL EXAMINERS,
*Defendant/Appellee.*

No. 1 CA-CV 13-0488
FILED 11-04-2014

Appeal from the Superior Court in Maricopa County
No.  LC2011-000735-001
The Honorable Crane McClennen, Judge

**AFFIRMED**

COUNSEL

Smith Law Group, Tucson
By Christopher J. Smith, E. Hardy Smith, Kathleen Leary
*Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Michael Raine
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Michael J. Brown joined.

---

**J O N E S**, Judge:

¶1  Nishith S. Shah, a licensed dentist, appeals the trial court's judgment affirming the decision of the Arizona Board of Dental Examiners (the Board) finding Shah engaged in unprofessional conduct and ordering him to complete sixteen hours of continuing education. Shah argues the Board's administrative proceedings denied him due process and challenges the Board's factual findings. Shah also contends the imposed penalty was excessive. For the following reasons, we affirm.

## FACTS & PROCEDURAL HISTORY

¶2  On November 17, 2010, Shah was performing oral surgery in his office on sixty-eight-year-old C.N. During the surgery, and while C.N. was under intravenous sedation, his blood oxygen saturation level suddenly dropped, and he went into asystole.[1] Shah and his surgical team commenced resuscitation measures, including three attempts to get "a shockable rhythm," but C.N. did not recover. Paramedics promptly transported C.N. to the hospital, where he was pronounced dead.

¶3  Through counsel, Shah self-reported the incident to the Board on November 29, 2010, and provided copies of C.N.'s surgical records. Those records, made contemporaneously with the surgery, consisted of three form "anesthesia sheets" containing handwritten "opnote[s]" and other notations regarding C.N.'s vital signs in ten-minute increments. The Board initiated a complaint and investigation based upon the reported incident, which contained two allegations: "Failure to report adverse occ[urrence]" and "Adverse Occurrence/Sedation."

¶4  The Board notified Shah that a Board-appointed panel (Panel) sought an informal interview (Panel Interview) for the purpose of investigating and determining the validity of the allegations. The Board's

---

[1] Asystole means "cardiac standstill or arrest—absence of a heartbeat." Dorland's Illustrated Medical Dictionary 159 (25th ed. 1974).

notice (Notice) informed Shah that the allegations, "if proven true, could constitute Unprofessional Conduct" under Arizona Revised Statutes (A.R.S.) section 32-1201(21)(n)[2] (defining "unprofessional conduct" as "[a]ny conduct or practice that constitutes a danger to the health, welfare or safety of the patient or public"), and listed the range of possible disciplinary and non-disciplinary measures. The Notice further advised Shah he would have the opportunity, at the Panel Interview, to present witnesses and evidence relating to the allegations, and that he was entitled to request from the Board factual information it would use in making its determination. Finally, the Notice informed Shah he had the legal right to refuse to cooperate with the Board in the informal interview process, in which case the matter would proceed to a formal hearing. *See* A.R.S. § 32-1263.02(C) (2008).[3]

¶5        Shah did not request a formal hearing; instead, he submitted a nine-page written response to the allegations and elected to proceed with the informal process. Shah then requested and obtained a continuance of the Panel Interview due to a conflict with his attorney's schedule. He later submitted a second request for a continuance, again based upon his counsel's unavailability, which the Board denied. Shah then appeared at the Panel Interview with a different attorney from the same firm. He testified, but did not present any other witnesses or evidence.

¶6        Following the interview, the Panel issued a report summarizing its factual findings and recommendations to the Board. The Panel recommended the Board dismiss the allegation of failure to report an adverse occurrence, apparently accepting Shah's explanation that the calculation of the ten-day period to report was extended by the Thanksgiving holiday, as the Board office was closed. Regarding the allegation of adverse occurrence/sedation, the Panel (1) identified deficiencies in Shah's record-keeping during C.N.'s surgery, (2) found

---

[2]  Although the legislature amended the statute in 2011, the amendment does not relate to the issues presented in this case. *See* 2011 Ariz. Sess. Laws, ch. 267, § 1 (1st Reg. Sess.). We therefore cite the current version, as we do all statutes that have remained materially unchanged.

[3]  Because the statute was materially revised in 2011, we cite the version in effect at the time the Notice was sent and the Panel Interview occurred. *See* 2011 Ariz. Sess. Laws, ch. 175, §§ 1-2 (1st Reg. Sess.) (effective July 20, 2011).

Shah was not aware of a Federal Drug Administration (FDA) black box warning[4] relating to a drug Shah administered to C.N. during the procedure, and (3) concluded Shah failed to follow pharmacologic protocol when C.N. went into asystole. The Panel recommended the Board conclude these facts amounted to unprofessional conduct, but acknowledged they were not likely causally related to C.N.'s death. The Panel therefore recommended discipline in the form of twelve and sixteen hours, respectively, of continuing education in the areas of Advanced Cardiac Life Support (ACLS) and pharmacology agents used in general anesthesia.

¶7 By letter to the Board, Shah objected to the Panel's report and requested his case be dismissed or, alternatively, the Board issue a non-disciplinary letter of concern. In response, the Panel investigator clarified several points, but affirmed its recommended findings to the Board.

¶8 Shah appeared at a meeting of the Board, to challenge the Panel's recommended findings and disposition. After hearing Shah's arguments and reviewing the investigative report, the Board voted to accept the Panel's factual findings with minor clarifications,[5] adopted the conclusion of unprofessional conduct, and ordered sixteen hours of continuing education in the area of pharmacology agents used in general anesthesia.

¶9 The Board denied Shah's request for a rehearing, and he appealed to the trial court pursuant to the Administrative Review Act. *See* A.R.S. §§ 12-901 to -914. The court affirmed the Board's decision, and Shah timely appealed. We have jurisdiction pursuant to A.R.S. §§ 12-913 and -2101(A)(1).

---

[4] As explained at the Panel Interview, a black box warning is "the FDA's most serious warning about potential side effects."

[5] In adopting the Panel's findings, the Board expounded upon the Panel's general observation that Shah inadequately documented the procedure by stating Shah's records for C.N. did not include EKG "strips," and contained "discrepancies in the pre and post EKG documentation," as well as "in the medication times and amounts."

**DISCUSSION**

I.      **Standard of Review**

¶10        In reviewing an administrative agency's decision, the trial court "shall affirm the agency action unless after reviewing the administrative record and supplementing evidence presented at the evidentiary hearing the court concludes that the action is not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion."   A.R.S. § 12-910(E).   Arbitrary and capricious agency action has been described as "'unreason[ed] action, without consideration and in disregard for facts and circumstances.'"   *Petras v. Ariz. State Liquor Bd.*, 129 Ariz. 449, 452, 631 P.2d 1107, 1110 (App. 1981) (quoting *Tucson Pub. Sch., Dist. No. 1 of Pima Cnty. v. Green*, 17 Ariz. App. 91, 94, 495 P.2d 861, 864 (1972)).   "The court must defer to the agency's factual findings and affirm them if supported by substantial evidence." *Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436, ¶ 11, 215 P.3d 1114, 1117 (App. 2009) (citations omitted).   "If an agency's decision is supported by the record, substantial evidence exists to support the decision even if the record also supports a different conclusion."   *Id.* (citing *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App. 1984)).

¶11        When we review the trial court's ruling affirming an administrative decision, we engage in the same process, "independently examin[ing] the record to determine whether the evidence supports the judgment."   *Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 557, ¶ 7, 48 P.3d 505, 507 (App. 2002) (citing *Carley v. Ariz. Bd. of Regents*, 153 Ariz. 461, 463, 737 P.2d 1099, 1101 (App. 1987)).   As a result, "we reach the underlying issue of whether the administrative action was illegal, arbitrary, capricious or involved an abuse of discretion."   *See Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prods., Inc.*, 167 Ariz. 383, 386, 807 P.2d 1119, 1122 (App. 1990).

¶12        Whether substantial evidence exists is a question of law for our independent determination.   *See id.* at 387, 807 P.2d at 1123. However, we view the evidence in the light most favorable to upholding an administrative decision. *Special Fund Div. v. Indus. Comm'n*, 182 Ariz. 341, 346, 897 P.2d 643, 648 (App. 1994).   Additionally, we review constitutional issues, including an alleged violation of due process, de novo. *See Carlson v. Ariz. State Pers. Bd.*, 214 Ariz. 426, 430, ¶¶ 12-13, 153 P.3d 1055, 1059 (App. 2007).

## II.     Due Process: Notice & Opportunity to be Heard

**¶13**         Shah first argues the Panel Interview violated his procedural due process rights because the Board failed to give him "any explanation of the investigation the . . . [P]anel would be conducting, the allegations against him, or the standard of care to be applied in the Panel's assessment or in the Board's decision regarding discipline."[6]     While neither party addressed the substance of *Comeau v. Arizona State Board of Dental Examiners*, 196 Ariz. 102, 993 P.2d 1066 (App. 1999), we find the case and its analysis controlling here, and hold that the investigative interview in this case satisfied the requirements of procedural due process.

**¶14**         It is true that Shah has a protected interest in his dental license, and he may not be deprived of that interest without due process of law. *Id.* at 106, ¶ 18, 993 P.2d at 1070. "When a professional license is at stake, 'the State's interest must justify the degree of infringement which ensues from the sanction, and appropriate procedures must be used to guard against arbitrary action.'" *Id.* at ¶ 19 (quoting *Schillerstrom v. State,* 180 Ariz. 468, 471, 885 P.2d 156, 159 (App. 1994)).  But "'the right to pursue [his] profession is subject to the paramount right of the state under its police powers to regulate business and professions in order to protect the public health, morals and welfare.'" *Id.* (quoting *Cohen v. State,* 121 Ariz. 6, 10, 588 P.2d 299, 303 (1978)).

**¶15**         Procedural due process ensures that a party receives adequate notice and opportunity to be heard at a meaningful time in a meaningful way by an impartial judge. *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976); *Hall v. Lalli*, 194 Ariz. 54, 57, ¶ 6, 977 P.2d 776, 779 (1999); *Comeau,* 196 Ariz. at 106-07, ¶ 20, 993 P.2d at 1070-71.  Due process is not, however, a static concept; rather "[t]he requirements of due process vary with the nature of the proceedings, the private and governmental interests

---

[6]  The Board argues Shah waived this due process objection on appeal by not raising it at any stage prior to filing his reply brief during the trial court's judicial review.  "[T]he waiver rule is procedural rather than jurisdictional, [and] we may forego application of the rule in our discretion." *Liristis v. Am. Family Mut. Ins. Co.*, 204 Ariz. 140, 143, ¶ 11, 61 P.3d 22, 25 (App. 2002) (internal citation omitted).  Because the parties have fully briefed the issue and we consider constitutional issues to be of considerable import, in the interest of justice, we choose to address the substance of Shah's claim.

at stake, and the risk that the procedure will lead to erroneous results." *Berenter v. Gallinger*, 173 Ariz. 75, 82, 839 P.2d 1120, 1127 (App. 1992) (citing *Maricopa Cnty. Juvenile Action JD-561*, 131 Ariz. 25, 27, 638 P.2d 692, 694 (1981)); *see also Carlson*, 214 Ariz. at 430–31, ¶ 15, 153 P.3d at 1059–60 (noting the flexible nature of due process does not require elaborate administrative hearings as long as there is notice and opportunity to be heard). Thus, the amount of process Shah was due during the Board's administrative proceeding is determined by the extent to which the continuing education order deprives him of his protected interest in his dentist license.

¶16 The Board has wide latitude to take one or more disciplinary actions against a licensee. *See* A.R.S. § 32-1263.01(A). Where certain forms of discipline that clearly deprive a licensee of his right to practice his profession — for example, license revocation or suspension — are implicated, a formal hearing must be initiated. *See* A.R.S. § 32-1263.02 (D)(1) (2008). Alternatively, the law provides for an informal investigative interview, if the Board deems the process appropriate and the licensee agrees to participate. A.R.S. § 32-1263.02(C) (2008). During the informal interview, the level of process due the licensee is commensurate to the seriousness of the penalty sought to be imposed. *See, e.g., Gaveck*, 222 Ariz. at 437-38, ¶¶ 14-21, 215 P.3d at 1118-19 (App. 2009) (finding insufficient notice regarding applicable standard of care where licensee faced censure); *Webb*, 202 Ariz. at 558-60, ¶¶ 8-17, 48 P.3d at 508-10 (finding same where probation imposed upon licensee); *Murphy v. Bd. of Med. Exam'rs*, 190 Ariz. 441, 448-49, 949 P.2d 530, 537-38 (App. 1997) (finding minimal process due to licensee in issuing a letter of concern that does not, as a matter of law, deprive licensee of rights or privileges).[7]

¶17 Here, as in *Comeau*, the Board decided the informal process was appropriate, and Shah "cooperated in that process until it produced a result he did not like. He then began to argue that he had been denied

---

[7] Shah relies heavily on *Gaveck* and *Webb* for his argument that he was entitled to an enhanced level of due process. However, those cases are distinguishable as they dealt with more serious forms of disciplinary action: public censure and probation. *Gaveck*, 222 Ariz. at 436, ¶ 9, 215 P.3d at 1117; *Webb*, 202 Ariz. at 556, ¶ 1, 48 P.3d at 506. Thus, neither *Webb* nor *Gaveck* is controlling, or may be relied upon to establish the amount of process due before the Board could order Shah to complete a limited number of continuing education credits.

procedural due process . . . ," 196 Ariz. at 107, ¶ 22, 993 P.2d at 1071, because he did not receive those enhanced procedures that attach only where serious disciplinary action is anticipated, or where the licensee invokes the formal process. And, as did the court in *Comeau*, we reject this argument. The statutory scheme "creates the investigative interview as an alternative to a formal hearing, if both the Board and the licensee agree. A licensee in [Shah's] situation can have either an investigative interview or formal hearing, but he cannot have one and then, if displeased with the result, have the other, too." *Id.* (citing A.R.S. § 32-1263.02(C), (D)(1) (2008)). Similarly, Shah cannot elect to proceed with the informal process and then argue a denial of the procedural due process rights that would have accompanied the formal process.

¶18            Here, Shah was provided the option to pursue the matter in a formal hearing. Assisted by counsel, Shah chose to participate in the informal Panel Interview. Shah elected not to present additional witnesses or other evidence at the informal hearing, although he had a right to do so. Thereafter, the Board ordered Shaw to complete sixteen hours of continuing education to address deficiencies identified within his record-keeping and pharmacological practice. An order requiring a licensee to complete a prescribed number of hours of continuing education can be considered either disciplinary or non-disciplinary. A.R.S. § 32-1263.01(A)(8), (B). Nonetheless, it is inarguably one of the least severe forms of discipline available to the Board to address ascertained deficiencies in a licensee's dental practice. *See generally* A.R.S. § 32-1263.01(A). Shah fails to identify, and we are unable to discern, any legal right or privilege affected by the Board's requirement he attend continuing education. To the contrary, participation in continuing education creates no obvious impediment to, and arguably improves, the quality of his dentistry practice.

¶19            Because the imposition of continuing education does not deprive Shah of any legal rights or privileges, we conclude he was entitled only to minimal due process. *See Murphy*, 190 Ariz. at 449, 949 P.2d at 538.

¶20            Shah alleges he received insufficient notice of the charges. The notice required to satisfy due process must be reasonably calculated to apprise the licensee of the pendency of an action and afford him a meaningful opportunity for explanation and defense. *Comeau*, 196 Ariz. at 108, ¶ 28, 993 P.2d at 1072. As applied to a medical licensee, due process requires "notice of the nature of the wrong charged and the particular instances of its perpetration." *Id.* at ¶¶ 28-29 (citing *Med. Licensing Bd. v. Ward*, 449 N.E.2d 1129, 1145 (Ind. Ct. App. 1983), and ultimately holding

notice of charges sufficient where dental licensee had notice of Board's allegations, was aware of contents of complaint, and knew what records the Board had because he had provided them).

¶21 The record reflects Shah had notice of the general allegations regarding the purported professional misconduct — namely, failure to timely report, and adverse occurrence during sedation. Shah was aware of the contents of the complaint, as he self-reported the incident. And, because he provided a copy of C.N.'s records to the Panel in advance of the Panel Interview, he "therefore knew what records the [P]anel and the Board had, and he had those records himself." *Comeau*, 196 Ariz. at 108, ¶ 29, 993 P.2d at 1072. Accordingly, we are not persuaded Shah was unaware of the general topics — in particular, the details of his own record-keeping, his familiarity with drugs administered to C.N.,[8] and general pharmacological protocol in the event of an adverse cardiac event[9]

---

[8] Shaw argues the Board improperly failed to notify him that knowledge of the Droperidol black box warning would "be a standard of care requirement." We disagree that the Board is obligated to articulate such a basic requirement as reading warning labels on drugs prior to administering them to patients. Furthermore, Shah fails to establish how this alleged lack of notice prejudiced him. Shah admits he was unaware of the warning located within the box from which he removed the drug he then administered to C.N. Given that admission, Shah cannot credibly assert he was surprised by the conclusion of the Panel. No error by the Board, reversible or otherwise, occurred. *See Cnty. of La Paz v. Yakima Compost Co.*, 224 Ariz. 590, 598, ¶ 12, 233 P.3d 1169, 1177 (App. 2010) (assuming a deprivation of due process but refusing to find reversible error when appellant failed to demonstrate resulting unreasonable prejudice).

[9] Shah also asserts due process required specific notice that he would be questioned regarding appropriate clinical intervention for treatment of cardiac emergencies or that the Board would apply ACLS protocol "as the standard of care without regard to *actual* events occurring in a medical emergency." We disagree. Again, the record reflects Shah admitted knowledge of what the ACLS protocol required and further explained to the Panel his reasons for deviating from it. Having made this admission, Shah does not explain how a lack of specific notice that the established and recognized protocol would be used by the Board to evaluate the propriety of his conduct prejudiced him or would have changed his testimony or the fact that he did not follow that protocol. Consequently,

— that would be discussed at the informal interview based upon his self-reporting of a patient death that occurred under anesthesia. We do not understand that, under the "'practicalities and peculiarities of the case'" at hand, *id.* at 107, ¶ 20, 993 P.2d at 1071 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)), the Board was obligated to provide Shah a script of proposed interview questions or spell out, in advance, his professional obligation to keep accurate timely records, read the warning labels on drugs administered, or follow established protocols when administering life-saving treatment during a cardiac event. The notice of the charges was sufficient.

¶22        The record also supports that Shah received an adequate opportunity to be meaningfully heard on the issues. *See id.* at ¶ 23 (finding due process satisfied during investigative interview where licensee did not face serious discipline, was represented by counsel, had sufficient notice of charges, and was provided the opportunity to testify and cross-examine witnesses). Shah chose to proceed to the informal Investigative Panel, had the right to be represented, and was represented by competent counsel at all times. Further, he had sufficient notice of the charges, the opportunity to request additional information and the evidence to prepare an explanation and present a defense. Although he elected not to do so, Shah was also advised of his right to present witnesses and evidence at the Investigative Panel. He presented his "side of the story" through his written response to the allegations of unprofessional conduct and participation in the Panel Interview. He did not object to the informal proceedings at that time and made no credible argument that other relevant evidence should have been presented, or would have been presented had the notice been more detailed or had he requested and participated in the formal hearing.[10] We therefore hold the

_____

pursuant to *Yakima Compost Co.*, 224 Ariz. at 598, ¶ 12, 233 P.3d at 1177, we find no due process violation, reversible or otherwise.

[10] Notably, as discussed at length in Part IV, *supra*, the findings ultimately adopted by the Board were based upon Shah's own factual admissions. Although Shah argued to the Board, *after* the Panel Interview concluded and the Investigative Report issued, that his staff should have been permitted to testify to the Board, we find nothing in the anticipated testimony that could or would counter Shah's testimony that he did not read the black box warning on the Droperidol, did not fully document C.N.'s cardiac status, and did not follow the pharmacological protocol when C.N. went into asystole. We further note Shah had opportunity to present witnesses and evidence at the Panel Interview. He did not do so,

investigative interview in this case satisfied the requirements of procedural due process.

### III.     Purported "Irregularities" in the Administrative Proceedings[11]

¶23     Shah identifies what he perceives to be "irregularities" with the administrative proceedings he contends deprived him of due process. First, Shah argues the Board's denial of his second request to continue the Panel Interview denied him due process because a particular lawyer was unavailable to represent him at the proceedings.  We reject this argument.

¶24     Shah points to no authority, and we are aware of none, to support his position.  Generally, mere dissatisfaction with counsel is insufficient to warrant reconsideration of issues already adjudicated.  *See King v. Superior Court*, 138 Ariz. 147, 151, 673 P.2d 787, 791 (1983).

¶25     Moreover, the record reflects another attorney from the same firm represented Shah at the interview, whom Shah concedes was "highly competent."   Therefore, at a minimum, Shah fails to establish any resulting prejudice from the circumstance that would support a finding of reversible error.  *See, e.g., Yakima Compost Co.*, 224 Ariz. at 598, ¶ 12, 233 P.3d at 1177 ("Even assuming [appellant] was deprived of [his] due process right to notice and an adequate opportunity to present [his] claims, . . . because [he] fails to demonstrate how [he] was unreasonably prejudiced by the deprivation, we do not find reversible error.") (citations omitted).

¶26     Additionally, we find no merit in Shah's contention, without any supporting authority, that the denial of his second request for a continuance constituted an abuse of discretion.  To the contrary, the Board noted its obligation to the public to timely resolve the investigation, and further indicated the oral surgeon who would be advising the Panel in the interview had already been rescheduled once for Shah's convenience and would be advising the Panel on another matter on the rescheduled date.

---

and cannot now complain that his own belated attempt to introduce evidence at a non-evidentiary proceeding *after* the investigation was completed was a deprivation of rights caused by the Board.

[11]  Shah incorrectly asserts the Board is no longer authorized to conduct investigative interviews. *See* A.R.S. § 32-1263.02(B) ("The board or its designees shall conduct necessary investigations, including interviews between representatives of the board and the licensee . . . .").

*See State ex rel. Corbin v. Tocco*, 173 Ariz. 587, 595, 845 P.2d 513, 521 (App. 1992) (finding no abuse of discretion where adequate explanation existed in the record to support the trial court's decision). Again, we find no reversible error occurred in denying Shah's second request to postpone the Panel Interview.

¶27 Shah next argues the Panel Interview was conducted unfairly because it was "unnecessarily adversarial." Specifically, he contends the oral surgeon who advised the Panel at the interview made sarcastic comments regarding Shah's surgery records and improperly implied Shah should have been able to recite verbatim the administrative rule he was alleged to have violated. This argument is unavailing.

¶28 Even assuming *arguendo* that the comments were less than professional, nothing in the record suggests the oral surgeon was biased, had a conflict of interest, or otherwise exhibited "behavior . . . 'so extreme as to display clear inability to render fair judgment.'" *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)). Indeed, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display," even if inappropriate or unprofessional, do not in and of themselves establish bias. *Liteky*, 510 U.S. at 555–56; *cf. United States v. Poland*, 659 F.2d 884, 894 (9th Cir. 1981) (finding no prejudice in trial judge's displays of irritation and impatience with defense counsel and use of sarcasm where evidence of defendant's guilt was overwhelming).

¶29 In fact, the Panel's report reflects exceeding care was given *not* to overstate the role of Shah's deficiencies and discrepancies in C.N.'s death. Specifically, the report states: "[the oral surgeon] and other panel doctors don't want to overreact and censure over something that would have had the same outcome no matter what Dr. Shah did." The oral surgeon further stated he "d[id] not want to infer" that anesthetic medications administered by Shaw "had any impact on the death of this patient . . . . It probably had nothing to do with the patient's death."

¶30 Furthermore, the Panel — and subsequently the Board — collectively decided that ordering continuing education was proper in this case, thereby effectively negating any alleged impropriety resulting from the purported sarcasm Shah argues was displayed at the interview. Accordingly, Shah has not satisfied his burden of establishing unfairness on this basis. *See Emmett McLoughlin Realty, Inc. v. Pima Cnty.*, 212 Ariz. 351, 357, ¶ 24, 132 P.3d 290, 296 (App. 2006) ("All decision makers, judges

and administrative tribunals alike, are entitled to a presumption of 'honesty and integrity,'" and the party asserting bias bears the burden of rebutting the presumption of fairness) (citing *Pavlik v. Chinle Unified Sch. Dist. No. 24*, 195 Ariz. 148, 154, ¶ 24, 985 P.2d 633, 639 (App. 1999)). Again, as this Court noted in *Comeau*, "[w]hat the record reflects is a conscientious effort by the [consultant] to do what he was appointed to do in service to his profession." 196 Ariz. at 108, ¶ 27, 993 P.2d at 1072.

## IV. Factual Findings

### A. EKG Reports and Documentation

**¶31** Shah next challenges the sufficiency of the Board's findings, first protesting the Board's finding that his records pertaining to C.N.'s surgery failed to include EKG strips and contained discrepancies in "pre and post EKG documentation."

**¶32** The Board found Shah violated Arizona Administrative Code (A.A.C.) R4-11-1301(D), which requires a dentist to:

> [K]eep an anesthesia record for each general anesthesia and semi-conscious sedation administered that . . . [i]ncludes the following entries:
>
> > a. Pre-operative and post-operative electro-cardiograph reports;
> >
> > b. Pre-operative, post-operative, and intra-operative pulse oximeter readings;
> >
> > c. Pre-operative and post-operative blood pressure and vital signs;
> >
> > d. Intra-operative blood pressures; and
> >
> > e. A list of all medications given, with dosage and time intervals.

A.A.C. R4-11-1301(D)(1) (2003).[12]

---

[12] This rule was materially revised and renumbered in 2013. *See* 19 A.A.R. 341, 350-51 (effective April 6, 2013).

¶33     Shah concedes his records do not contain printed EKG strips.  But because A.A.C. R4-11-1301(D)(1)(a) refers to "reports," Shah contends the Board improperly failed to inform him that printed strips are required under the applicable standard of care.  Instead, he maintains his handwritten notations of the EKG readings made during C.N.'s surgery "adequately document[] the patient's cardiac status in compliance with [A.A.C. R4-11-1301(D)(1)(a)]."

¶34     Shah's argument in this specific regard is inconsistent with his testimony at the Panel Interview.  When the oral surgeon asked Shah whether his surgical records have "[p]re and post operative EKG reports," Shah answered they did not, explaining: "Sometimes our printer would get jammed and it wouldn't print properly.  And that's what happened on this particular incident." This answer implied that absent mechanical failure, such strips would have been available.  This statement was directly contrary to Shah's previous written response to the Board's request for EKG monitoring strips, which asserted "his practice is to use the EKG to monitor the patient's condition but he does not generally print out the strips."

¶35     Viewing this evidence in the light most favorable to sustaining the Board's findings, as we must, Shah's conflicting explanations reflect, at a minimum, he was aware prior to the Panel Interview that computer printed EKG strips were required to comport with the standard of care and to satisfy A.A.C. R4-11-1301(D)(1)(a). Furthermore, Shah's testimony at the Panel Interview that his EKG printer would "sometimes . . . get jammed" created a reasonable inference that, although he was aware his surgery record-keeping did not satisfy the standard of care, he failed to take appropriate and timely steps to rectify the EKG monitor's printing issues before C.N.'s surgery.  We therefore cannot conclude Shah was prejudiced by any alleged error in failing to inform him of that standard.  Accordingly, we cannot find reversible error on this basis.

¶36     The Board's finding regarding pre- and post-operative EKG documentation discrepancies in Shah's surgical records is also supported by substantial evidence.  The FDA's black box warning for Droperidol,[13] issued in 2001, requires surgical patients receiving the medication, such as C.N., to undergo a 12-lead EKG prior to its administration "to determine if a prolonged QT interval . . . is present."  In those patients for whom the

---

[13]  The drug is also known as "inapsine" and is sometimes improperly referred to in the record as "roperidol."

potential benefits of the drug outweigh potentially serious arrhythmias, EKG monitoring should continue post-treatment for two to three hours.

¶37        At the Panel Interview, Shah admitted he did not use a 12-lead EKG prior to administering Droperidol and does not typically "monitor" post-surgical patients who received the drug. Based upon this admission, the Board could reasonably infer Shah's pre- and post-operative EKG documentation was non-compliant with the specific procedures, required by the FDA, to determine what, if any, "prolonged QT interval [was] present" at the time of and after C.N.'s surgery. Thus, viewed under the applicable deferential standard, substantial evidence supports the Board's findings regarding deficiencies in Shah's records.

### B.        Medication Times and Amounts

¶38        Next, Shah contests the Board's revised finding of discrepancies in the surgical records related to medication times and amounts. Specifically, he implies reversible error occurred because the Panel, and the Board, failed to specifically cite A.A.C. R4-11-1301(D)(1)(e), which required a dentist to keep an anesthesia record listing *all medications given* with dosage and time interval. Alternatively, he argues his surgical records comply with R4-11-1301(D)(1)(e), and the Board's finding otherwise is "factually wrong and contrary to the record." We disagree.

¶39        First, the Panel addressed Shah's notation in the surgery records indicating he administered a drug to treat hypertension at 10:35 a.m., when C.N.'s blood pressure was normal, and thirty minutes after it had spiked. This notation supports a conclusion that the drug was given improperly at a time when it was unnecessary, or alternatively, administered the drug at a time different than that noted in his records. Furthermore, the Board specifically identified discrepancies in the times and amounts of all medications Shah administered during C.N.'s surgery.

¶40        Finally, the Panel specifically referenced two gaps in Shah's surgical anesthesia records where he failed to make any notations, the first from 8:30 a.m. to 8:55 a.m., and the second from 10:05 a.m. to 10:35 a.m. At first glance, Shah's records seem to bear out this finding regarding the two "gaps." Upon closer inspection, the records do contain notations regarding anesthesia medications given at 8:38/8:45 and 10:15, effectively closing the first gap, and shortening the second. However, there are no notations of medications given during the twenty-minute period between 10:15 a.m. and 10:35 a.m.

¶41 Notwithstanding the lack of evidence supporting the first gap, the record supports the second, and the Board's expressed concern remains valid: a third party reviewing the records of C.N.'s surgery would not be able to determine what amounts of medications, if any, were administered during the twenty-minute gap. Accordingly, substantial evidence supports the Board's finding[14] that discrepancies existed regarding medication times and amounts in Shah's surgical records in violation of A.A.C. R4-11-1301(D)(1)(e). Therefore, no reversible error occurred on this basis.

### C. Pharmacological Protocol

¶42 Shah next argues the Board's finding that he failed to follow applicable pharmacological protocol for ACLS is not supported by substantial evidence. He does so while simultaneously conceding he did not administer the drugs mandated by ACLS protocol for a patient in asystole. We find this argument unavailing.

¶43 Although Shah posited at the Panel Interview that he undertook equally appropriate, alternative life-saving measures, the Panel, and ultimately the Board, disagreed with the propriety of Shah's failure to follow the protocol. Even if we disagreed with its reasoned opinions, we would not substitute our judgment for the Board's. *Ariz. Water Co. v. Ariz. Corp. Comm'n*, 217 Ariz. 652, 659, ¶ 23, 177 P.3d 1224, 1231 (App. 2008) ("'That a judge of the superior court, or that this court, might be of the opinion that a different order should have been entered than that which the [agency] did enter, does not, of itself, warrant reversal of the [agency].'") (quoting *Ariz. Corp. Comm'n v. Fred Harvey Transp. Co.*, 95 Ariz. 185, 189, 388 P.2d 236, 238 (1964)). Shah's admitted non-compliance with ACLS protocol is substantial evidence to support the Board's finding.

---

[14] Contrary to Shah's implication otherwise, the Board may lawfully revise the Panel's recommended findings as long as the revisions are supported by substantial evidence. *See, e.g.*, *Ritland v. Ariz. State Bd. of Med. Exam'rs*, 213 Ariz. 187, 191, ¶¶ 12-14, 140 P.3d 970, 974 (App. 2006) (holding the Medical Board, as the body responsible for issuing a final administrative decision, "may overrule [an administrative law judge's] findings [of fact] if it finds evidence in the record for doing so").

### D.    "Black Box" Warning

¶44        Shah also challenges the merits of the FDA's black box warning for Droperidol. This argument is not relevant to the imposition of discipline against Shah.

¶45        The basis for the Board's factual finding and ultimate conclusion that Shah engaged in unprofessional conduct was not Shah's method of administering Droperidol inconsistently with the protocol set forth in the black box warning, but his admitted lack of awareness of the warning.    Again, Shah's admission constitutes substantial evidence supporting the Board's finding, and no reversible error occurred.

### E.    Untimely Self-Report

¶46        Shah next challenges the Board's factual finding regarding his untimely self-report. *See* A.A.C. R4-11-1305 (requiring dentist to report death occurring in dental office during administration of, or recovery from, general anesthesia "within 10 days after the occurrence").    Shah asserts he made his report on the business day following the tenth day after the adverse occurrence, which fell on a Saturday, in accordance with Arizona law.

¶47        Shah cites A.A.C. R2-19-107, which extends the last day of a time period if it falls on a Saturday, Sunday, or legal holiday.    That rule, however, applies to administrative proceedings in the Office of Administrative Hearings, and is therefore not applicable here. *Id.*    In the absence of any other authority, we find no justification to vacate this factual finding. *See* Ariz. R. Civ. P. 61 ("[N]o error or defect in any ruling or order or in anything done or omitted by the court or . . . the parties is ground for . . . vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."); ARCAP 13(a)(6) (requiring argument in appellate brief contain "citations to the authorities, statutes, and parts of the record relied upon"); *Ritchie v. Krasner*, 221 Ariz. 288, 305, ¶ 62, 211 P.3d 1272, 1289 (App. 2009) (deeming waived an issue unsupported by legal authority).

## V.    Reasonableness of Continuing Education Order

¶48        Finally, Shah argues the imposition of sixteen hours of continuing education on the topic of pharmacological agents used in general anesthesia "is excessive because it is unwarranted."    We disagree. As noted herein, the Board's findings are supported by substantial

evidence, consisting almost entirely of Shah's own admissions. An order of continuing education was within the Board's discretion pursuant to A.R.S. § 32-1263.01(B), and was supported by the facts elicited at the informal hearing.

¶49 Where the record contains credible evidence of acts warranting discipline, "it can scarcely be said that discipline within the permissible range was taken without reasonable cause." *Maricopa Cnty. Sheriff's Office v. Maricopa Cnty. Emp. Merit Sys. Comm'n*, 211 Ariz. 219, 222-23, ¶ 16, 119 P.3d 1022, 1025-26 (2005); *see also Bishop v. Law Enforcement Merit Sys. Council*, 119 Ariz. 417, 421, 581 P.2d 262, 266 (App. 1978) ("The determination of the penalty imposed by an administrative body will not be disturbed unless there has been an abuse of discretion."). Accordingly, we find no basis to reverse the continuing education order.

## CONCLUSION

¶50 Shah was provided sufficient notice and opportunity to be heard at the informal investigative interview regarding the self-reported death of his patient while under anesthesia. To the extent Shah has identified any deficiencies in the administrative proceeding, they were minor, non-prejudicial, and did not deny Shah due process. Furthermore, the Board's decision requiring Shah to complete continuing education is supported by substantial evidence, is consistent with Arizona law, is not arbitrary and capricious, and does not constitute an abuse of discretion. Accordingly, the trial court's judgment upholding the Board's decision is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED : gsh